UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
―――――

| | | |
|---|---|---|
| JAMASA Z. DERRING, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:04-cv-796 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| KENNETH McKEE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving three nonparolable life sentences after a jury convicted him of three counts of first-degree, premeditated murder. MICH. COMP. LAWS § 750.316(1)(a). The Allegan County Circuit Court imposed these sentences on January 21, 2000. Petitioner challenged his conviction on direct appeal, without success.

The *pro se* habeas corpus petition raises six grounds for relief:

(1)      denial of due process and the right to confrontation by introduction of hearsay testimony;

(2)      improper admission of prior bad acts;

(3)      ineffective assistance of trial counsel;

(4)      prosecutorial misconduct in the "negligent" introduction of perjured testimony; and

(5)     denial of a fair trial by the prosecutor's attempt to shift to petitioner

the burden of proving alibi.

Respondent has filed an answer to the petition, supported by the state trial and appellate records.

Upon review of the state record and the submissions of the parties, I conclude that the petition is not

meritorious and recommend that it be denied on its merits.

## Proposed Findings of Fact

**A.     Trial Court Proceedings**

The state prosecution arose from the shooting death of three teenage victims:  Dustin

Sherrell, age 16; his sister Darla Sherrell, age 17; and Jonathan Edwards, also 17.  The three victims

were found shot to death in the Sherrell family residence on the afternoon of April 1, 1999.

Petitioner was a neighbor of the Sherrell family and was well-acquainted with both Dustin and Darla.

He was observed at the Sherrell residence and accompanied the three victims on the previous

evening and during the morning of April 1, when the four were seen together at various places.

Three bullets taken from the crime scene were forensically linked to two guns possessed by

petitioner.

The prosecution contended that petitioner and Dustin Sherrell had murdered Antonio

Flores about six weeks earlier.[1]  Dustin Sherrell had told a number of people, including the two other

victims, about his role in the Flores murder.  Sherrell had also implicated petitioner.  The

prosecution's theory of motive was that petitioner killed the victims in order to silence them.  "The

---

[1] Petitioner was charged with open murder in the death of Antonio Flores. *People v. Derring*, Case No. 99-011247-FC (Allegan County, Michigan).  The prosecutor *nolle prosed* the case on January 4, 2000, after petitioner's convictions in the present case.

defendant shot and killed the three people in this trailer to prevent himself from being held responsible for the shooting of Antonio Flores, because the defendant knew that those kids knew that he had shot Mr. Flores." (Prosecution Opening Statement, Trial Transcript (TT) II, 12, docket # 19).

The case was tried before a jury in the Allegan County Circuit Court, Judge Harry Beach, presiding, beginning on December 6, 1999. The prosecution called twenty-five witnesses. For purposes of this habeas corpus proceeding, it is not necessary to recount all the witness testimony in detail. Substantial testimony was devoted to linking petitioner to evidence found at the crime scene. Petitioner was often seen in possession of both a .22 caliber handgun and a .25 caliber handgun. (*E.g.*, John Winston, TT II, 164-68; Judith Taylor, TT III, 55-56; Joseph Green, TT II, 249-52; Jessica Jones, TT II, 188-191). Both .22 and .25 caliber bullets were found at the crime scene, either in the victims' bodies or embedded in places in the trailer. Ballistics examination linked these bullets to guns possessed by petitioner. (TT III, 201-233). The state Court of Appeals would later summarize the ballistics evidence, as follows:

> Flores, Edwards and Darla Sherrell all were killed with a .22 caliber firearm, while Dustin was shot with a .25 caliber firearm. A state police firearms expert testified that (1) .22 caliber bullets from Flores' and Edwards' bodies had been fired from the same gun; (2) a .25 caliber bullet removed from Dustin's head, a .25 caliber bullet removed from the head of a deceased dog buried in the Sherrell backyard, which defendant in March 1999 had shot after the dog was struck by a vehicle, and a .25 caliber bullet found in a bullet-riddled air conditioner behind defendant's residence, all were fired from the same gun; (3) the many fired .22 caliber cartridge casings found at the murder scene and a .22 caliber shell casing found behind defendant's residence all were fired by the same gun; and (4) a .25 caliber shell casing found under Dustin's body was fired by the same gun that had fired three .25 caliber shell casings found at defendant's residence.

(Op., 4, found in Michigan Court of Appeals record, docket # 25).

The prosecution called David Porter, a 27-year-old inmate in the Allegan County Jail who had met petitioner while they were both incarcerated in the maximum security wing pending trial.  (TT III, 257-59).  Porter testified on direct examination that petitioner told him he shot the victims to silence them about the Flores killing:

Q.    Alright.  What did Jamasa Derring tell you, if anything, about the murders of three people in the Pullman area?
A.    He told me he shot three kids.
Q.    He told you he shot three kids?
A.    Yeah.
Q.    Did he tell you their names?
A.    Dusty, Darla -- someone like that, and I don't know the other one, I can't remember.

Q.    Did he tell you where he shot them?
A.    Yeah, he said he shot two of 'em in the face and one of 'em in the head.
Q.    Did he tell you why he shot them?
A.    He said he got scared because he thought they was gonna tell police about shooting someone else.
Q.    Who?
A.    A mexican [sic] guy named Torres.

(TT III, 253).  He offered details allegedly told him by petitioner concerning the manner of killing the teenagers.  (*Id.*, 256-57).  On cross-examination, Porter admitted that he came forward with this information "to get a deal about my case," (*id.*, 260), although he was only expecting a deal and did not know what he might receive.  (*Id.*, 261).  Then, Porter immediately recanted and said that petitioner did not tell him anything and that he had lied.  (*Id.*).  Porter then said, "Free Jamasa, free Jamasa Derring.  That's what I think you all should do.  He didn't do this."  (*Id.*, 262).  The judge ordered Porter removed from the courtroom.

In support of its theory of motive, the prosecution offered testimony of four statements purportedly made by Dustin Sherrell, one of the victims, to his friends concerning the

-4-

Flores murder.  Defense counsel objected to the admission of these statements, both on grounds of hearsay and undue prejudice under Mich. R. Evid. 403.  In pretrial proceedings, the trial court heard the challenged testimony on a separate record and ruled that the statements bore sufficient indicia of trustworthiness to qualify as an exception to the hearsay rule under Mich. R. Evid. 804(b)(6), the so-called "residual exception," and that their highly probative value outweighed any prejudice.

*Joseph Green*, a cousin of Dustin and Darla Sherrell, testified that about two days after the Flores shooting he spoke with Dustin in his bedroom while petitioner and other friends were present.  Dustin stated that he had shot Flores and indicated the place where the crime had occurred.  He also said that he and petitioner had beaten up a lady who was in Flores's car, so "she was not talking."  (TT II, 255-258).  During this conversation, petitioner did not join in, but "kind of glared" at Dustin.  (*Id.* at 258-283).  During cross-examination, Green testified that petitioner pointed a gun at him during the course of the conversation.  (TT II, 289-291).  Two days later, Dustin changed his story and told Green that he had been joking about the Flores murder.  (*Id.* at 261-62).

*Nicole Lawrence*, a 16-year-old cousin of Dustin and Darla Sherrell, testified that Dustin told her that "a month ago Mr. Derring shot some Mexican guy."  She further testified that Dustin provided details of the robbery and murder of Flores.  (TT II, 313-18).  Dustin denied any personal involvement in the shooting, however.  (TT II, 334).

The next challenged testimony was that of *Jessica Jones*, an 18-year-old friend of Dustin and Darla, who had dated Dustin for a time before the murder.  Ms. Jones was at the Sherrell trailer on the night of the Flores shooting.  (TT II, 180).  At some point, petitioner left the trailer alone for a period exceeding an hour.  He then returned and left again with Dustin.  (*Id.*, 181).  When Dustin and petitioner returned, Dustin was "very agitated" and petitioner also seemed nervous.  (*Id.*,

-5-

183).  Petitioner said "they had robbed some nuns, beat up a cop, robbed a school bus, and they were on crack."  (*Id.*, 203-05).  Later in the evening, *petitioner* said that he had been involved in a shooting, but Jones thought that he was joking.  (*Id.*, 183-86).[2]  Two days after the Flores murder, however, Jones and Dustin were alone in his bedroom when she asked him if petitioner was serious when he stated that he had been involved in a shooting.  Dustin told her that petitioner had shot someone.  (TT II, 187-88, 205-07).

The last challenged statement was that of *George Segelstrom, Jr.*, an adult neighbor of the Sherrell family.  Segelstrom testified that approximately one month before the Sherrell shootings he gave Dustin and Jon Edwards a ride to a party.  Segelstrom overheard Dustin saying to Edwards, "I can't believe he -- that he shot him," referring to the murder of Flores.  When Segelstrom inquired who, Dustin identified petitioner.  Dustin said that the killing was over money or drugs and that if they went to police, "he would shoot the family."  Segelstrom, who had recent convictions for forgery, breaking-and-entering, and receiving stolen property, said nothing to police or to Dustin Sherrell's father concerning the conversation.  (TT II, 293-302).

The defense presented two witnesses.   Detective Rick Cain testified that approximately ten times during his interview of petitioner, petitioner denied his involvement in the shootings or otherwise asserted his innocence.  (TT IV, 107-08).  During cross-examination, the prosecutor elicited the fact that petitioner never offered an alibi or tried to explain where he was either before or after the homicides.  (*Id.*, 116-120).  Defense counsel did not object to either the question or the answer.  Defendant also called Detective Craig Gardiner, who spoke to George

---

[2] Another witness also testified that petitioner admitted to her that he was "involved" in the murder of Flores.  (Ashley Mitts, TT II, 224-25).

Segelstrom.  According to Detective Gardiner, Segelstrom did not report to him any conversation in a car concerning the Flores murder, but did state that he had a similar conversation with Dustin Sherrell and Jonathan Edwards outside the Sherrell residence.  (TT IV, 123-25).

The court delivered jury instructions, which are not germane to the habeas corpus issues.  After deliberation, the jury found petitioner guilty of three counts of first-degree, premeditated murder and guilty of three counts of possession of a firearm during the commission of a felony.  (TT V, 87-88).  Petitioner was sentenced to three mandatory, concurrent life sentences on the murder convictions, with consecutive, mandatory two-year terms on the felony-firearm convictions.

### B.    Appellate Proceedings

Petitioner, represented by appellate counsel, appealed as of right to the Michigan Court of Appeals.  (*See* Court of Appeals Record, docket # 25).  Petitioner's appellate brief raised six grounds.  First, petitioner challenged the admission of the out-of-court statements of Dustin Sherrell, both under the state evidence rules and under the federal Confrontation Clause.  Second, petitioner sought a new trial arising from the introduction of evidence concerning the Flores murder which, "although probative of the material issue of motive," was unfairly prejudicial.  Third, appellate counsel argued that petitioner's retained trial attorney was constitutionally ineffective when he "repeatedly" elicited damaging information on cross-examination.  Fourth, petitioner charged the prosecutor with misconduct arising from "negligent submission" of the perjured testimony of David Porter and emphasis on that testimony in final argument.  Fifth, petitioner asserted prosecutorial misconduct arising from the alleged effort of the prosecutor to shift the burden of proof to petitioner

during the testimony of Detective Cain, by suggesting that petitioner must offer an alibi.  Finally, petitioner argued instructional error arising from the denial of an instruction concerning flight.

By unpublished, *per curiam* opinion issued November 2, 2001, the Michigan Court of Appeals rejected all appellate issues and affirmed the convictions.  The court analyzed at length the admission of the out-of-court statements of Dustin Sherrell under the catchall exception to the hearsay rule, MICH. R. EVID. 804(b)(6).  At the outset, the court recognized that the hearsay analysis was coextensive with Confrontation Clause analysis, because both the evidence rule and the Confrontation Clause required "circumstantial guarantees of trustworthiness."  (Op., 2, citing *People v. Lee*, 622 N.W.2d 71 (Mich. Ct. App. 2000)).  The court found that the hearsay declarations of Dustin Sherrell were plainly relevant, as they tended to establish that petitioner had a motive to kill the victims.  Reviewing the totality of the circumstances surrounding the decedent's statements to Jones, Green, and Lawrence, the court found sufficient circumstantial guarantees of trustworthiness to satisfy both the Confrontation Clause and the hearsay rule.  (Op., 3-4).  The court went on to find that the circumstances surrounding the statements to Segelstrom were not trustworthy and did not meet the constitutional test.  The court found that these statements, however, were harmless beyond a reasonable doubt, in light of the overwhelming evidence of defendant's guilt arising from the unrebutted ballistics analysis tying the murder bullets to petitioner.  (Op., 4).

In reviewing the claim of prejudice under Evidence Rule 403, the Court of Appeals determined that the issue was unpreserved for appeal because of the lack of a proper objection in the trial court.  The court went on to review the issue for plain error under state law.  Finding an admittedly proper purpose for introduction of evidence of petitioner's involvement in the Flores murder, the court determined that the "very high probative value" of the evidence was not

-8-

substantially outweighed by any risk of unfair prejudice.  The court noted that the ballistics evidence of petitioner's involvement in the Flores murder related directly to the identification of petitioner as the killer in the present case, as the .22 caliber bullets from the bodies of both Flores and Edwards had been fired from the same gun.  (Op., 5).

The court rejected the claim of ineffective assistance of trial counsel arising from elicitation of damaging testimony on cross-examination, finding that petitioner had failed to overcome the strong presumption of sound trial strategy.

With regard to the claim of prosecutorial misconduct arising from the presentation of the testimony of David Porter, the Court of Appeals again found an appellate default arising from a lack of contemporaneous objection.  Reviewing the issue for plain error, the court found no misconduct and no plain error, determining that the prosecutor sought in good faith to admit the testimony and that the closing argument properly presented the evidence admitted at trial and reasonable inferences arising therefrom.  (Op., 6).

Finally, the court rejected the claim that the prosecutor committed misconduct by attempting to shift the burden of proof to defendant to explain his whereabouts at the time of the murders.  The court noted that, once a criminal defendant waives his constitutional rights and volunteers to speak with police, evidence of defendant's demeanor and failure to answer particular questions is admissible.  The court found that the prosecutor's question did not have the effect of shifting the burden of proof to defendant to show his innocence, but properly attacked his credibility. Again, the issue was unpreserved, so review was only for plain error.  (Op., 6).

Petitioner sought leave to appeal to the Michigan Supreme Court.  By order entered July 2, 2002, the application for leave to appeal was held in abeyance pending the decision in *People*

*v. Katt*, 662 N.W.2d 12 (Mich. 2003). The opinion in the *Katt* case was issued on May 30, 2003. By order entered December 12, 2003, the Supreme Court directed that this case be scheduled for oral argument. 672 N.W.2d 174 (Mich. 2003). On March 10, 2004, the Michigan Supreme Court heard oral argument on the application for leave to appeal. By order entered April 30, 2004, the state Supreme Court denied leave to appeal. *People v. Derring*, 678 N.W.2d 437 (Mich. 2004). Justices Young and Taylor, while concurring in the denial of leave to appeal, wrote separately to express their continuing discomfort with the broad application of the residual exception to the hearsay rule. Those justices also remarked that it was at least arguable that the evidence admitted in this case had a mixed purpose. The justices expressed concern that "uncritical eyes will use the broadly defined catchall exception as a shorthand method to introduce evidence even when the evidence is admissible under an enumerated exception or when the evidence does not contain hearsay at all." *Id.*

On November 29, 2004, petitioner filed his *pro se* habeas corpus action, raising the first five claims analyzed and rejected by the state Court of Appeals. Respondent has filed an answer (docket # 9), asserting that claims 3, 4, and 5 are barred by procedural default and that claims 1 and 2 should be denied on their merits.

## AEDPA Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v.*

-10-

*Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 125 S. Ct. 847, 853 (2005) (citations omitted). If a state court adjudicated the claim, AEDPA standards must be applied. 28 U.S.C. § 2254(d). Thus, even in instances where a state court has not clearly articulated its reasoning, if the circumstances suggest that the state court actually considered and decided the issue, the review is not *de novo,* but is limited by the deferential AEDPA standards. *See Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005); *Onifer v. Tyskiewicz*, 255 F.3d 313, 316 (6th Cir. 2001); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721,727 (6th Cir. 2003), *cert. denied*, 540 U.S. 1158 (2004); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir.) ("[W]hen a claim has not been adjudicated on the merits in State Court proceedings, and has not been procedurally defaulted, we look at the claim *de novo* rather than through the deferential lens of AEDPA.") (citations omitted), *cert. denied*, 126 S. Ct. 744 (2005); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that

was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655. This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for

constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d at 943.   The AEDPA standard includes an important temporal limitation.   "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412).   Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d at 318; *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry").

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings.  28 U.S.C. § 2254(e 1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Payne v. Bell*, 418 F.3d 644, 663-64 (6th Cir. 2005); *Lancaster*, 324 F.3d at 429.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005); *Abdus-Samad v. Bell*, 420 F.3d 614, 620 (6th Cir. 2005).

**Discussion**

I.      **Confrontation Clause Issue**

        Petitioner challenges the admission of four out-of-court statements of one of the victims, Dustin Sherrell.  In the state appellate system, petitioner asserted that these statements were inadmissible hearsay, not subject to any recognized hearsay exception, and that they violated his rights under the Confrontation Clause. (Petition at 11-13).  The question whether admission of these statements violated the hearsay rule is one of state law and cannot form the basis for federal habeas corpus relief, which is limited to claims that a petitioner is in custody in violation of the federal Constitution or laws.  28 U.S.C. § 2254(a); *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Johnson v. Karnes*, 198 F.3d 589, 593 n.3 (6th Cir. 2000) (admissibility of evidence under hearsay rules not cognizable on habeas corpus).

        Petitioner's Confrontation Clause challenge is certainly reviewable on habeas corpus.  The Confrontation Clause of the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  In general, the introduction of out-of-court statements by declarants who do not testify at trial can violate Confrontation Clause rights, if the statements are admitted for the truth of the matter asserted. *See Lee v. Illinois*, 476 U.S. 530, 539 (1986).  At the time this case was tried in the circuit court, Confrontation Clause analysis of hearsay statements was governed by *Ohio v. Roberts*, 448 U.S. 56 (1980), under which the prosecution bore the burden of showing that the declarant was unavailable and that the statement bore adequate indicia of reliability.  A statement was considered to have sufficient indicia of reliability if it either fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness."  448 U.S. at 66.  While this case was pending on

-14-

direct review before the Michigan Supreme Court, the Supreme Court of the United States issued its decision in *Crawford v. Washington*, 541 U.S. 36 (2004), which introduced a fundamental change in Confrontation Clause analysis.  In *Crawford*, the Court held that testimonial, out-of-court statements offered against the accused to establish the truth of the matter asserted may only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine the declarant.  Under *Crawford*, reliability is no longer the test.  541 U.S. at 60-61.

*Crawford* was issued on March 8, 2004.  The Michigan Supreme Court did not conclude direct review in the present case until April 30, 2004.  Because the case was pending on direct review when *Crawford* was issued, this case would be subject to *Crawford*, if the rule of *Crawford* applied.  *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (new procedural rules for criminal prosecutions must be applied retroactively to all cases, state or federal, pending on direct review).  It is clear, however, that *Crawford* does not apply to the present case, because Dustin Sherrell's out-of-court statements were not "testimonial" within the meaning of *Crawford*.  While the *Crawford* Court declined to comprehensively define "testimonial," it stated that the term applies "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  541 U.S. at 68.  The Sixth Circuit, and several other appellate courts, have identified the proper inquiry as "whether the declarant intends to bear testimony against the accused."  *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).  That intent, in turn, may be determined by asking whether a reasonable person in the declarant's position would anticipate his statement being used against the accused and investigating and prosecuting the crime.  *Id.*  On this basis, the *Cromer* Court determined that statements given by a confidential informant to police are testimonial and thus subject to the *Crawford* test.  By contrast, the statements of Dustin Sherrell,

-15-

made to his friends and acquaintances outside the presence of police, when no investigation was underway, cannot possibly be deemed testimonial, as a reasonable person in Dustin's position would not have anticipated that his statements would be used against the accused in a criminal investigation or proceeding. Consequently, even under the most expansive definition of "testimonial" evidence, *Crawford* is inapplicable.

The Sixth Circuit has held that, for non-testimonial hearsay, the rule of *Roberts v. Ohio* continues to apply. *See United States v. Johnson*, 430 F.3d 383, 395 (6th Cir. 2005); *United States v. Franklin*, 415 F.3d 537, 546 (6th Cir. 2005). This court must therefore review the decision of the Michigan Court of Appeals on the Confrontation Clause issue under AEDPA, to determine whether the Court of Appeals adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Roberts* and other controlling cases. 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 407 (2000). It must be noted at the outset, however, that some of the out-of-court statements involved in this case were clearly not hearsay or, at best, were admitted for hearsay and non-hearsay reasons. The statements of Dustin Sherrell to the effect that petitioner killed Antonio Flores were hearsay to the extent that they were offered to prove the truth of the matter asserted -- that petitioner did indeed kill Flores. The prosecution's theory, however, was not that petitioner's killing of Flores somehow proved that he killed the three victims in this case. Rather, the prosecution's case rested on its ability to prove that Dustin Sherrell was telling other people (principally the other two victims) that petitioner had killed Flores and that petitioner knew it. Joseph Green, for example, testified that Dustin Sherrell spoke of the murder to Green and others while petitioner was present. Likewise, Jessica Jones testified that Dustin Sherrell made

incriminating statements to her and other persons in petitioner's presence.  This testimony was certainly admissible to show that Dustin Sherrell was incriminating himself and petitioner in front of other persons and that petitioner knew it.  Such testimony was not hearsay to prove these facts (as opposed to proving that petitioner was actually responsible for the Flores murder), and admission of this testimony for such purposes would not violate the Confrontation Clause.  It is well settled that the Confrontation Clause is not violated when an out-of-court statement is offered, not to prove the truth of the matter asserted, but for the very purpose of showing that the statement was made.  *See Crawford*, 541 U.S. at 59 n.9 (Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *Tennessee v. Street*, 471 U.S. 409, 417 (1985); *Cromer*, 389 F.3d at 676; *Anthony v. Dewitt*, 295 F.3d 562-63 (6th Cir. 2002).  In such circumstances, the Confrontation Clause is not violated, because the fact to be proven is the very making of the statement itself in petitioner's presence.  Both Joseph Green and Jessica Jones were present in court to be cross-examined on that subject.

Likewise, the testimony of Joseph Green, relating the incriminating statements made by Dustin Sherrell in petitioner's presence, involved an adoptive admission and therefore was not hearsay under Michigan Evidence Rule 801(d)(2)(B).  One may adopt a statement by any appropriate means, such as language, conduct, or silence.  *See United States v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996).  The courts generally hold that a criminal defendant adopts another's statement by remaining silent when the circumstances indicate that an innocent defendant would normally be induced to respond.  *Id.* at 244; *see, e.g., United States v. Kehoe*, 310 F.3d 579, 590-91 (8th Cir. 2002) (defendant's failure to contradict or deny his co-defendant's statements at the time they were made indicated adoption).  For example, in *United States v. Fortez*, 619 F.2d 108 (1st Cir. 1980), an

acquaintance asked two people whether they had "done a bank robbery," and one of them said yes and explained his participation in the crime, implicating the other person in the process. The First Circuit held that this was "the type of exchange to which the silence of the unresponsive accomplice, assuming he is present and conscious of the conversation, 'gives consent.'" 619 F.2d at 116. Likewise, Joseph Green testified that petitioner did not join in the conversation, but "kind of glared" at Dustin Sherrell while he incriminated the two. Adoptive admissions do not violate the Confrontation Clause because if the defendant accepts the out-of-court statements as his own, cross-examination of the declarant concerning the statement becomes "unnecessary and irrelevant." *Jinadu*, 98 F.3d at 245. An adoptive admission "avoids the confrontation problem because the words of the hearsay become the words of the defendant." *Poole v. Perini*, 659 F.2d 730, 733 (6th Cir. 1981).

This court is therefore left with the task of evaluating, under AEDPA standards, the decision of the state Court of Appeals regarding those portions of Dustin Sherrell's out-of-court declarations that truly were hearsay. The state Court of Appeals acknowledged that "circumstantial guarantees of trustworthiness must exist to satisfy a defendant's constitutional right to confront the witnesses against him." (Op., 2). The court cited the Supreme Court decision in *Idaho v. Wright*, 497 U.S. 805 (1990), as well as state-court authorities applying *Roberts v. Ohio* to hearsay questions.[3] In *Roberts*, the Court held as follows:

---

[3] As was typical at the time, the state Court of Appeals conflated the inquiries whether an out-of-court statement was admissible under a hearsay exception and whether it was admissible over a Confrontation Clause challenge. This mode of analysis was consistent with prevailing federal law. *See, e.g., White v. Illinois*, 502 U.S. 346, 355-58 (1992); *United States v. Hadley*, 431 F.3d 484, 498 n.8 (6th Cir. 2005). Under both the residual hearsay exception and Confrontation Clause jurisprudence, the prosecution was required to show particularized guarantees of reliability.

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts*, 448 U.S. at 66. The out-of-court statements of Dustin Sherrell were admitted under the residual hearsay exception created by Mich. R. Evid. 804(b)(6)(A). The Supreme Court has held that the residual hearsay exception is not "firmly rooted." *Wright*, 497 U.S. at 817. "Hearsay statements admitted under the residual exception, almost by definition, therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception." *Id.* Such statements are nevertheless admissible if the prosecution can show "particularized guarantees of trustworthiness . . . drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 820.

The Michigan Court of Appeals determined that three of the four out-of-court statements of Dustin Sherrell bore the requisite indicia of reliability. The court did so after "reviewing the totality of the circumstances surrounding Dustin's statements to Jones, Green, and Lawrence." (Op., 3). The appellate court analyzed the reliability issue as follows:

> The trial court found adequate indicia of reliability on the bases that Dustin's statements were spontaneous for the most part, consistent, made in emotional states, made privately to friends in whom Dustin likely would confide, were consistent with a young person dealing with the emotions of a traumatic event, and did not indicate a motive to fabricate or shift blame. We cannot conclude that the trial court clearly erred in finding these factors, which properly tend to establish the statements' trustworthiness. *Lee, supra* at 178.
>
> Furthermore, our review of the record discloses additional particularized guarantees of trustworthiness not mentioned by the trial court. First, the

-19-

circumstances, including that Dustin was with defendant at the time Flores was killed and his demeanor immediately afterward supports the conclusion he had witnessed a traumatic event, indicate that Dustin spoke from personal knowledge when he made statements about his and defendant's involvement in the Flores murder.  Second, the reason Dustin could not testify, because he had been murdered, militates in favor of admissibility and also supports the trial court's conclusion that admission of Dustin's statements served the general purpose of the court rules and the interests of justice. MRE 804(d)(6)(C); *Lee, supra*.  Third, two of the statements occurred within a couple days of the Flores murder, a time frame supportive of the statements' admissibility, while another of the statements occurred within four weeks of the Flores murder, a time frame also supportive of admissiblity to a lesser extent. Additionally, the statements either occurred in the safety of Dustin's own bedroom or in the safe haven of Lawrence's home.

(Op., 3-4).

Petitioner has not shown that the analysis of the state Court of Appeals either conflicts with Supreme Court precedent or represents an unreasonable application thereof.  The state appellate court viewed the totality of the circumstances, especially noting that Dustin made spontaneous statements in an emotional state to persons in whom he would likely confide.  The court also noted the absence of a motive to fabricate.  The appellate court's reliance on the fact that petitioner procured the declarant's unavailability by killing him finds support in numerous federal appellate decisions as a reason to admit the statements.[4]  *See, e.g., United States v. Dhinsa*, 243 F.3d 635, 650-52 (2d Cir. 2001) (collecting cases); *United States v. Cherry*, 217 F.3d 811, 820-21 (10th Cir. 2000) (defendant deemed to waive confrontation rights if preponderance of evidence establishes that he procured declarant's unavailability through wrongdoing); *United States Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (defendant waived right to confrontation by killing declarant).  The care and

_____

[4] This concept is now codified in the Federal Rules of Evidence.  *See* FED. R. EVID. 804(b)(6).

-20-

objectivity of the state appellate court's decision is further demonstrated by its conclusion that Dustin's statements to Segelstrom did not bear the same indicia of trustworthiness.

On similar facts, the Sixth Circuit has upheld, against a Confrontation Clause challenge, admission of the testimony of witnesses recounting statements by an out-of-court declarant. In *Anthony v. DeWitt*, 295 F.3d 554 (6th Cir. 2002), the Ohio courts admitted the out-of-court statements of Rommell Knox to Regina Knox, his wife. On habeas review, the Sixth Circuit determined that the statements did not fit within a firmly rooted hearsay exception, but nevertheless had sufficient indicia of trustworthiness to meet the standard of *Roberts* and its progeny. 295 F.3d at 563. Reviewing the factors enunciated in *Dutton v. Evans*, 400 U.S. 74 (1970), the court found that (1) the statements concerned an express assertion of fact; (2) the declarant had personal knowledge of the fact arising from his presence at the scene; (3) the close proximity of the statement in time after the crime negated the danger of faulty memory; and (4) the surrounding circumstances did not support fabrication. 295 F.3d at 563-64. Commenting on the final factor, the court stated: "Fourth, it is unlikely that Rommell fabricated the facts because he voluntarily made statements to his wife in the privacy of his home and they were against penal interest. Such statements made to a family member or perceived ally, in confidence, have previously been deemed sufficiently trustworthy." 295 F.3d at 264. Consequently, the court upheld the conviction under the AEDPA standard. *Accord, Denny v. Goodmanson*, 252 F.3d 896, 903 (7th Cir. 2001) (Confrontation Clause not violated by admission of co-defendant's confession, which was made to trusted friends and relatives rather than police officers).

The reasoning of the Sixth Circuit closely mirrors that employed by the Michigan Court of Appeals in the present case. Both courts emphasized the declarant's firsthand knowledge,

-21-

lack of motive to fabricate, and close family relationship to the listener.  If the issue is the objective reasonableness of the state court's decision, the employment of similar reasoning by our own and other federal courts of appeals in similar cases is a strong indicator of reasonableness.

The state Court of Appeals was also correct in determining that admission of the decedent's statements to Segelstrom constituted harmless error.  Violations of the Confrontation Clause are subject to harmless error analysis.  *See Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986); *Hill v. Brigano*, 199 F.3d 833, 846-47 (6th Cir. 1999).  On collateral review, the federal court must apply the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), under which habeas relief may be granted only where the error had a substantial and injurious effect or influence on the jury's verdict.  507 U.S. at 623.  In the present case, the statements of the decedent introduced through Segelstrom's testimony were, at most, cumulative.  As noted above, some of the out-of-court statements were not objectionable under the hearsay rule at all.  Certain of the other out-of-court declarations were hearsay, but properly admitted because of an appropriate finding of indicia of reliability.  In this context, Segelstrom's testimony was merely cumulative of the properly admitted evidence concerning the decedent's out-of-court statements.  Moreover, as noted by the state Court of Appeals (Op., 4), the other evidence of petitioner's guilt, especially the forensic evidence linking him to numerous bullets and cartridges found at the scene, was exceedingly strong.  Under the *Brecht* standard, admission of the hearsay statements contained in Segelstrom's testimony must be deemed harmless error.  *See Anthony*, 295 F.3d at 564 (admission of hearsay evidence was at best harmless because it was cumulative of other evidence); *Hill*, 199 F.3d at 847 (where majority of information already before the jury and the evidence of guilt was strong, Confrontation Clause error was harmless).

Where, as here, the state appellate court has adjudicated a federal claim and articulated its analysis, review is not *de novo*, but is limited by the deferential standard of 28 U.S.C. § 2254(d). Habeas relief can be granted only where the state court's application of established Supreme Court precedent is "objectively reasonable." *See Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). The decision of the state Court of Appeals cannot be deemed either contrary to or an unreasonable application of clearly established Supreme Court authority. Petitioner's Confrontation Clause challenge must therefore fail.

## II.   Rule 403 Issue[5]

Petitioner's second habeas claim (Petition at 13-14) seeks to overturn the finding of the state courts that evidence of petitioner's complicity in the murder of Antonio Flores was not excludable under Evidence Rule 403, which allows a court to exclude evidence that is substantially more prejudicial than probative. *See* MICH. R. EVID. 403. Both the trial court and the Michigan Court of Appeals found that the evidence of Flores's murder was introduced for a proper purpose (to show petitioner's motive) and not to prove petitioner's generally bad character. Those courts also held that the evidence had "very high probative value," which was not substantially outweighed by any prejudicial effect. In his habeas corpus petition, petitioner repeats the arguments that he made in the state appellate courts.

---

[5] Respondent argues that this and other grounds in the petition are barred by the doctrine of procedural default, because petitioner failed to raise a contemporary objection at trial and the state court of appeals for that reason reviewed only for plain error. Although respondent's defense appears meritorious, analysis of the procedural default issue requires a complicated, multi-step analysis. Where, as here, the merits on a habeas claim are easily resolvable, judicial economy counsels in favor of disposition on the merits rather than engaging in the more complex procedural default analysis. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003), *cert. denied*, 543 U.S. 880 (2004).

Petitioner's challenge under Evidence Rule 403 must fail, for two related reasons. First, state-court evidentiary rulings are not reviewable on federal habeas corpus. *See Estelle*, 502 U.S. at 67-68. Petitioner's challenge under Evidence Rule 403 contains no federal constitutional aspect. Of course, if an evidentiary error is so fundamental that it taints the entire prosecution so as to deny the defendant a fundamental right to a fair trial, habeas corpus relief will be in order. *Id.*; *see Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005); *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002). This case does not, however, fall within that narrow exception. In petitioner's own reply brief (docket # 37), he admits that there was substantial evidence tying him to the Flores murder.

> On February 14, 1999, Antonio Flores was shot and killed. There was evidence that petitioner was responsible for that killing. A .22 caliber bullet was used to kill Mr. Flores. The same caliber bullet was used to kill the victim in this case. There was testimony that petitioner made admissions regarding killing Mr. Flores, as described early in the case. There was also hearsay testimony that the victim and a Mr. Jonathan Edward, another victim in this case, were attempting to reduce their contact with petitioner.

(Petitioner's Reply Brief, docket # 37, at 14). In light of these admissions, it is impossible for a habeas court to conclude that the trial court committed a fundamental error in admitting critical, well-supported evidence of the Flores killing, which provided both the motive for petitioner's acts in the present case and linked petitioner, through firearms-related evidence, to the triple murder. (*See* Court of Appeals Op., 5 n.1).

A second, related reason for rejecting petitioner's challenge to the admission of evidence under Rule 403 is that his claim is not supported by clearly established federal law as enunciated by the United States Supreme Court. The Supreme Court has never held that a trial court commits constitutional error by admitting relevant, probative evidence, even if it has some potential for prejudicial effect. In order to prevail under AEDPA, a petitioner must rely on the "clearly

established" holdings, and not the dicta, of Supreme Court decisions. *See Williams*, 529 U.S. at 412. The holdings of the United States Supreme Court have never constitutionalized the balance of probative value against prejudice as embodied in Evidence Rule 403. In the absence of such authority, AEDPA prohibits relief.

> **III.    Ineffective Assistance of Trial Counsel**

Petitioner's next claim is that his trial counsel was ineffective for "repeatedly" eliciting damaging information on cross-examination. The state Court of Appeals reviewed this claim on the record, finding "nothing in the record to overcome the strong presumption that defense counsel's questioning of the witness constituted sound trial strategy." (Op., 5).

The Supreme Court of the United States has clearly established a defendant's Sixth Amendment right to the effective assistance of counsel at trial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* standard, a defendant is deprived of the effective assistance of counsel if the attorney's performance falls below an objective standard of reasonableness and a reasonable probability exists that, but for counsel's conduct, a different result would have occurred. *Id.* at 686. Because the underlying legal standard has been clearly established by *Strickland*, habeas corpus review of a claim of ineffective assistance of counsel proceeds under the "unreasonable application" prong of section 2254(d)(1). *See Williams*, 529 U.S. at 397-98. This provision of AEDPA permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from Supreme Court decisions but "unreasonably applies that principle to the facts" of petitioner's case. *Id.* at 413. In order for a federal court to find a state court's application of Supreme Court precedent to be "unreasonable," the state court's decision must have

been more than incorrect or erroneous. *See Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Rather, the state court's application must have been "objectively unreasonable." *Id.*

The habeas corpus petition identifies three separate bits of information elicited by defense counsel on cross-examination upon which petitioner now bases his Sixth Amendment claim:

(1)     During the cross-examination of Joseph Green, Green testified that petitioner pointed a gun at him in Dustin Sherrell's bedroom on the day that Sherrell discussed his involvement in killing Antonio Flores.

(2)     During cross-examination of Judith Taylor, the witness testified that she was "a little concerned" about petitioner, because she once got up at three in the morning and found him standing in her kitchen. She also testified that Jonathan Edwards had raised the subject of a gun and asked petitioner to get it. In response, petitioner gave Edwards "an evil look."

(3)     During cross-examination, Lawrence Taylor testified that when petitioner and the other young people involved in the case came to his house, Taylor did not note any arguments or disagreements, but noticed "a real evil look" from petitioner.

(Petition at 14-15).

On direct review, the state Court of Appeals determined that petitioner had not overcome the strong presumption that defense counsel's questioning of these witnesses constituted sound trial strategy. (Op., 5). Independent review of the transcript confirms that this is not an unreasonable application of the *Strickland* test. Counsel's questioning cannot be deemed in any fashion incompetent, unreasonable, or falling below standards of professional conduct. With regard

-26-

to the cross-examination of Joseph Green, it will be recalled that Green testified on direct examination concerning incriminatory statements made by Dustin Sherrell while petitioner himself was present.  On cross-examination, defense counsel was successful in having the witness testify that the relationship between petitioner and Dustin Sherrell was good and that the witness considered petitioner a friend.  (TT II, 268-69).  To reinforce this concept, counsel asked whether petitioner ever threatened the witness, to which Green testified, "He's pointed a gun at me once before."  (*Id.*, 269).  Counsel then established that the witness never reported the incident to police and that Green thereafter continued to associate with petitioner.  (*Id.*).  On balance, the effect of the testimony was trivial and was substantially neutralized by counsel's follow-up questions.

Judith Taylor was the mother of one of the victims, Jonathan Edwards.  On cross-examination, defense counsel elicited from her the fact that Dustin Sherrell, petitioner, and her son spent a considerable amount of time together at her house "just having a good time."  (TT III, 60).  Similarly, on the night of the murder, Ms. Taylor saw all three boys and did not have any concern.  (*Id.*, 62).  In response to the question, "Now, would it be fair to say ma'am that the overall visit went rather well?", the witness volunteered that she was "a little concerned about Jamasa."  (*Id.*, 62).  Her concern arose from the fact that she got up at 3:00 a.m. and found Jamasa in her kitchen.  Counsel then was successful in having her say that petitioner appeared to be warming himself at the kitchen stove.  (*Id.*).  Again, the testimony was trivial, counsel substantially blunted it by follow-up questions, and it cannot possibly have had a prejudicial effect.

Counsel then questioned Ms. Taylor concerning a trip to Georgia being planned by the three boys.  In that context, she testified that Jonathan brought up the subject of a gun and asked petitioner to get it.  Counsel asked, "What did Jamasa say when Jonathan asked him to go get the

gun?"  Ms. Taylor gave an unresponsive, or at least unexpected, answer, responding that petitioner looked at Jonathan and "gave an evil look."  (*Id.*, 65).  However, after doing so, petitioner did as requested and went to the car, bringing back the gun so the boys could look at it.  (*Id.*, 66).  Again, petitioner does not explain how this fleeting testimony concerning "an evil look" had any influence on the outcome of the trial.

During the cross-examination of Lawrence Taylor, the witness likewise volunteered that petitioner had given him "a real evil look."  (TT III, 90).  Counsel immediately established that the look came in response to Taylor's calling petitioner a name and making an objectionable racial remark in his presence.  (*Id.*, 90-91).  On balance, counsel certainly got the better of the exchange and was successful in demonstrating to the jury that Lawrence was an ignorant bigot.

Petitioner has not established either the performance or the prejudice prong of a meritorious claim under *Strickland*.  Defense counsel is not responsible for random bits of bad information that come out on cross-examination, especially when volunteered by the witness. Petitioner's theory that counsel should have somehow known what the witness would say before asking a question ignores the reality of criminal practice, in which the tools of civil discovery are unavailable to defense counsel, who must often feel his way through treacherous territory on cross-examination.  The remarks elicited on cross-examination were fleeting and trivial in their impact. Given the substantial evidence concerning petitioner's constant possession of firearms, one more incident of brandishing a firearm and some testimony about "evil looks" were of no consequence. Petitioner cannot show prejudice.

The state Court of Appeals decision, rejecting petitioner's Sixth Amendment claim under the *Strickland* standard, did not constitute an unreasonable application of Supreme Court precedent.  Petitioner's Sixth Amendment claim must therefore fail.

## IV.    Presentation of Perjured Testimony

Petitioner's fourth claim for habeas corpus relief arises from the presentation of the testimony of David Porter, an Allegan County jail inmate who testified concerning an alleged jailhouse statement by petitioner and then immediately recanted.  Petitioner asserts two acts of prosecutorial misconduct arising from this testimony.  First, he asserts that the prosecution's "negligent submission of perjured testimony" constituted misconduct.  (Petition at 16)  Second, he asserts that the prosecution's reliance on that testimony in final argument, event after Porter recanted, constituted misconduct.  (*Id.*).

Under settled Supreme Court authority, "egregious misconduct" by the prosecution can give rise to constitutional claim if it undermines the fairness of a trial.  *See Donnelly v. De Christoforo*, 416 U.S. 637, 647-48 (1974).  The statements of the prosecution must be viewed in the context of the entire proceeding in order to determine whether they affected the fairness of the trial.  *United States v. Young*, 470 U.S. 1, 11-12 (1985).  The prosecutor may not *knowingly* present false testimony and has a duty to correct testimony that he knows to be false.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).

Petitioner's first claim -- that the prosecutor "negligently" presented perjured testimony -- fails to state grounds for habeas corpus relief under this rule.  By definition, the Due Process Clause is only offended when a prosecutor acts knowingly in presenting false testimony.

Petitioner therefore bears the burden of showing the knowledgeable and deliberate use of perjured evidence by the prosecution. *See Burks v. Egeler*, 512 F.2d 221, 224 (6th Cir. 1975); *accord King v. Trippett*, 192 F.3d 517, 523 (6th Cir. 1999) ("To be entitled to habeas relief, the petitioner must show that the prosecution knowingly used perjured testimony."). Petitioner in the present case has not alleged or proved the knowing use of perjured testimony. Rather, petitioner affirmatively asserts that the prosecutor was merely negligent. Such an allegation fails to state a claim for habeas corpus relief.

Petitioner further argues that, once Porter recanted his testimony on the witness stand in front of the jury, the prosecution was guilty of misconduct by relying on the Porter testimony in final argument. Examination of the prosecutor's final argument discloses no misconduct. During final argument, the assistant prosecutor asserted that Porter's "behavior in court was certainly unorthodox, but his testimony has some value." (TT V, 14). The prosecutor examined the circumstances surrounding Porter's decision to come forward, and asked the jury to determine how Porter came to know the details of petitioner's crime, if petitioner had not confessed to Porter while they were both in jail. (*Id.*, 15). The prosecutor conceded that there was "no doubt about it that David Porter is a liar." (*Id.*, 16). She then advanced the reasons why the jury should determine that Porter was lying when he recanted, rather than lying during his direct testimony. (*Id.*). She cautioned the jury to consider the evidence itself and that if the prosecution's position "isn't supported by that evidence it should be discounted." (*Id.*, 17). The court's final instructions to the jury emphasized that issues of credibility were for the jury to determine and that the jury should consider, among other issues, whether the witness deliberately lied about something important to the case. (*Id.*, 71).

-30-

On direct review, the Michigan Court of Appeals determined that the prosecution's initial presentation of Porter's testimony was done in good faith and that the closing argument properly presented the evidence admitted at trial and reasonable inferences arising therefrom. (Op., 6). Petitioner has not demonstrated that these holdings are contrary to clearly established Supreme Court authority. There is no evidence to suggest that the prosecution knew that Porter's testimony was false, nor is it at all clear that his recantation was true. As pointed out by the prosecution in final argument, Porter did seem to know details of the murders that he should not otherwise know. Once the jury heard the direct testimony and the recantation, both parties were free to argue their respective positions to the jury. The prosecutor was not guilty of any misconduct in this regard.

### V.    Alleged Shifting of the Burden of Proof

Finally, petitioner asserts that the prosecution denied his due-process rights by suggesting that "it was incumbent upon him to offer an alibi and explanation for his whereabouts at the time of the Sherrell homicide." (Petition at 16). This claim arises from the prosecutor's questioning of Detective Cain regarding petitioner's failure to provide police with details of his whereabouts after the triple murders. Cain was called by defense counsel to establish that petitioner had repeatedly asserted his innocence during questioning by police. (TT IV, 107-08). On cross-examination, the prosecutor elicited from Cain the fact that during police interrogation, petitioner never explained where he was before or after the killings. (*Id.*, 115-16). In redirect examination, the detective as forced to admit that petitioner had indicated that he was in Holland with his mother during the general time frame. (*Id.*, 117-18). Petitioner now argues that this series of questions somehow deprived him of a fair trial.

Petitioner's assertion of a federal constitutional claim arising from the prosecution's questions to Detective Cain is utterly frivolous. In neither the state appellate courts nor this court has petitioner cited any Supreme Court authority even remotely suggesting that a prosecutor may not question a police officer concerning the contents of an otherwise voluntary statement by a criminal defendant. To be sure, a prosecutor may not use a defendant's post-arrest, post-*Miranda* silence for impeachment purposes. *See Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976). Once, however, a criminal suspect decides to talk to police, there is nothing improper about eliciting the details of what the suspect said, or failed to say, during questioning. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) (*per curiam*). The prosecutor never stated that petitioner bore the burden of proving anything, nor did the questions to Detective Cain imply such a conclusion. Once defense counsel elicited information from Cain concerning the content of petitioner's voluntary statement to police, the prosecutor committed no misconduct by eliciting further information concerning what petitioner said and did not say.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.

Dated:  February 1, 2006                  /s/  Joseph G. Scoville
                                          United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All

objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).